**UNITED STATES of America, Plaintiff,**

v.

**Luis Guadalupe RIVERA, Kenneth Rodriguez, and Arnaldo Wilson Lopez, Defendants.**

**Crim. No. 93–165 (JP).**

United States District Court,
D. Puerto Rico.

Aug. 5, 1993.

Carlos A. Pérez, Asst. U.S. Atty., Hato Rey, PR, for plaintiff.

Guillermo Ramos Luiña, Hato Rey, PR, for defendant Guadalupe Rivera.

Laura Maldonado, Asst. Federal Public Defender, Old San Juan, PR, for defendant Rodríguez.

Joseph Laws, San Juan, PR, for defendant Wilson Lopez.

## OPINION AND ORDER

PIERAS, District Judge.

On May 27, 1993, all three defendants were charged with possession with intent to distribute approximately two (2) ounces (gross weight) of heroin. On June 18, 1993, defendant Arnaldo Wilson Lopez ("Lopez") filed a Motion to Suppress (docket No. 12) certain heroin which was seized from an apartment in the second floor of Los Lirios Public Housing Project in Cupey, Rio Piedras. The other two defendants promptly asked for leave to join defendant Lopez's motion and the Court granted their motions. Defendants' motion to suppress alleges that the heroin must be suppressed because it is the fruit of an illegal search conducted by Puerto Rico Police Department officers in violation of the Fourth Amendment of the Constitution of the United States of America. The government opposed defendants' motion (docket No. 17) on June 30, 1993. The Court held a hearing on July 27, 1993, to determine whether the heroin seized should be suppressed. Based on the evidence presented at

the hearing the Court concludes that the heroin was legally and constitutionally seized and, therefore, the government shall be free to present it as evidence in its case against the defendants. The evidence received at the hearing included the testimony of agent Wilfredo Gonzalez, who testified on behalf of the government, the testimony of Tomas Gonzalez Melendez, who testified for the defendants, and three exhibits presented by the defendants at the hearing (Defendants Exhibits A, B, & C).

## I. Findings of Fact

Upon consideration of the evidence presented at the Suppression Hearing, including an assessment of the credibility of the witnesses, the Court makes the following findings of fact:

1. On the evening of May 15, 1993, agent Wilfredo Gonzalez and another agent of the Puerto Rico Police Department were conducting a "preventive" patrol in Los Lirios Public Housing Project ("the project") and its surrounding areas in an unmarked police vehicle.

2. As they were driving inside the project, at approximately 6:30 p.m., agent Gonzalez noticed a vehicle closely following another. One of the automobiles was a wine-colored Pontiac Trans–Am and the other one was a blue Volvo of unspecified model.

3. The agents followed the two automobiles at a close distance, but far away enough not to be noticed, because they had previously received information from a reliable confidential informant that two automobiles of similar description had been involved in illegal drug transactions in the same project.

4. The agents followed the two automobiles to the beginning of a dead-end street within the project. As they drove behind the two automobiles, agent Gonzalez heard people shouting "Agua!, agua!" ("Water!, water!"). Agent Gonzalez testified that it was his experience that individuals involved in illicit drug transactions often advise others of the presence of police by crying out "Agua."

5. The agents continued to follow the two automobiles until they parked in front of apartment building number fifteen (15) in the project. Apartment building number fifteen (15) is well-known among law enforcement agents as a location where illegal drugs are bought and sold.

6. The agents continued to observe the automobiles after they parked. Agent Gonzalez observed five individuals hastily exit from the two automobiles and rapidly start walking towards apartment building fifteen (15).

7. Agent Gonzalez observed an object fall out of a yellow plastic bag carried by one of the five individuals he had seen exiting one of the cars.

8. Agent Gonzalez exited the patrol car to observe and identify the fallen object. At this point, he observed the five individuals entering an apartment on the second floor of building number fifteen (15). Upon picking up and examining the fallen object agent Gonzalez determined, based on his experience and training, that it was a small package containing controlled substances.

9. Agent Gonzalez called for reinforcements to help in the arrest of the five individuals who had gone into the second-floor apartment of building number fifteen (15). Ten back-up officers arrived approximately five minutes later and, accompanied by agent Gonzalez, proceeded to the second-floor apartment of building fifteen (15).

10. When the officers arrived at the apartment, they knocked on the door. The door was opened by one of the five individuals agent Gonzalez had seen exiting one of the two automobiles. The officers then asked the persons inside the apartment to step outside the apartment for identification purposes. The five individuals inside the apartment complied. From outside the apartment, while the individuals were exiting the apartment, agent Gonzalez observed inside the apartment, lying on top of a table, the yellow plastic bag from which the object he had identified as containing narcotics had fallen.

11. After all five individuals had exited the apartment and it was ascertained that nobody else was inside the apartment, agent Gonzalez entered the apartment to retrieve the yellow plastic bag.

12. When agent Gonzalez examined the bag he observed that it was in a tattered condition.

13. Agent Gonzalez looked inside the bag to determine its contents and discovered that it contained several hundred other small packages like the one he had recovered earlier. Based on agent's Gonzalez's experience and training he determined that these packages also contained controlled substances.

14. Agent Gonzalez sought the arrest of the men who entered the second-floor apartment of building fifteen (15) because he suspected that the bag from which the small package he had recovered contained more small packages similarly packed with heroin.

15. The Lirios Housing Project is well-known among law enforcement officials as infected with illegal drug dealing activity and as being effectively under the control of well-armed drug organizations who have often shot at law enforcement officials in the past.

16. Agent Gonzalez, his partner, and the officers who arrived on the scene to help effect the arrest, all feared for their life while at the project.

17. Requiring agent Gonzalez to obtain a warrant for the bag once he had obtained first hand perception of the contraband inside it would have involved danger to the police officers participating in the arrest as it would have forced the officers to re-enter or to remain in the dangerous building after making a visible and unpopular arrest in the project.

18. Requiring agent Gonzalez to wait for a warrant authorizing the seizure of the bag containing heroin would have placed the heroin at a high risk of loss as the project is controlled by drug dealing organizations. It would have been in the interest of these organizations to destroy the evidence as soon as the police officers left the building.

## II. Conclusions of Law

 Warrantless searches are *per se* unreasonable under the Fourth Amendment, except for specifically established and well-delineated exceptions. *Coolidge v. New Hampshire,* 403 U.S. 443, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971). The burden to show the existence of exigencies warranting departure from the general rule is on the party seeking the exemption. *Id.* The government in this case advances two exceptions pursuant to which its seizure of evidence at issue in this case should be exempted from the general warrant requirement. The government alleges that the bag at issue in this case was seized lawfully pursuant to the "plain view" doctrine. The government also alleges that exigent circumstances justified the seizure because the evidence might have been in danger of imminent destruction and the officers effecting the arrests were in great danger.

 We first address the "plain view" doctrine argument. "It is well established that under certain circumstances the police may seize evidence in plain view without a warrant." *Id.* at 465, 91 S.Ct. at 2037. Whether property in plain view of the police may be seized turns on the legality of the intrusion that enables them to perceive and physically seize the property in question. *Texas v. Brown,* 460 U.S. 730, 738, 103 S.Ct. 1535, 1541, 75 L.Ed.2d 502 (1983). Requiring the police to obtain a warrant once they have obtained a "first-hand perception of contraband" would be a "needless inconvenience" that might involve danger to the police and the public. *Id.* at 739, 103 S.Ct. at 1541 (*quoting Coolidge v. New Hampshire,* 403 U.S. at 468, 91 S.Ct. at 2039).

The First Circuit has set forth three criteria that must be present for the "plain view" exception to apply. "First, the officers' presence at the point of discovery must be lawful. Second, discovery of the seized item must be inadvertent. Third, the item's evidentiary value must be immediately apparent to the searchers." *United States v. Rutkowski,* 877 F.2d 139, 140–41 (1st Cir.1989) (*citing to Texas v. Brown,* 460 U.S. at 736–737, 103 S.Ct. at 1540). However, the Supreme Court in *Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990), held that the plain view exception does not require that the discovery of the items seized be inadvertent.

In *Horton,* the Court held that the seizure of certain items not listed in the search war-

rant a police officer investigating an armed robbery was executing was permissible even though the officer testified that he also was interested in finding other evidence connecting the accused to the crime. *Id.* 130–131, 110 S.Ct. at 2304. The *Horton* Court reasoned that the statement in *Coolidge* that discovery of evidence in plain view must be inadvertent did not command the majority of the court, was not essential to the judgment of the court in that case, and thus was not binding precedent. In addition, the court stated that the conclusion of the plurality in *Coolidge* requiring that a "plain view" discovery be inadvertent was flawed because the interests that the plurality sought to protect with such a requirement could best be protected, or were already being protected, by evenhanded law enforcement and the particularity requirement of warrants. *Id.* at 136–138, 110 S.Ct. at 2307–2308. Finally, the court underscored that the Fourth Amendment prohibition against general searches and warrants serves primarily as a protection against unjustified intrusions on privacy and that the seizure of an object in plain view does not involve an intrusion on privacy. *Id.* at 141, 110 S.Ct. at 2310. The First Circuit has not revisited this area again. Nevertheless, we decide this motion in a manner consistent with the Supreme Court's ruling in *Horton.* *See Id.* at 136–141, 110 S.Ct. at 2307–2310.

Agent Gonzalez's seizure of the yellow plastic bag in this case was justified under the "plain view" exception. Agent Gonzalez had probable cause to arrest at least one of the men who had gone into the second floor apartment of building number fifteen as he had first-hand knowledge that he had been carrying contraband. In addition, agent Gonzalez had probable cause to believe that all five men who had exited from the wine-colored Trans–Am and the blue Volvo were in the project for the purpose of engaging in an illegal drug transaction as he was in possession of reliable information that two automobiles of similar description had been involved in illegal drug transactions in

the project before and because Los Lirios project is well-known among law enforcement officers as a well-armed camp where illegal drug transactions occur every day.[1] Finally, other details, such as the screams of "Agua, agua!" and the fact that the men's final destination was in building fifteen (15)—a building renowned for its drug-related violence—gave agent Gonzalez enough probable cause to seek the arrest of one or more of the men who entered the apartment. Therefore, agent Gonzalez's action of knocking on the second-floor apartment of building number fifteen and asking the men in the apartment to step out for identification purposes was warranted.

Agent Gonzalez's "intrusion"—knocking on the apartment's door and asking the men inside the apartment to step out—which enabled him to perceive the bag was entirely lawful in addition to being only minimally intrusive. Agent Gonzalez noticed the bag as the five men were voluntarily stepping out of the apartment; his presence outside the apartment at that moment continued to be lawful.

The fact that agent Gonzalez's discovery of the bag was not "inadvertent" does not make its seizure unlawful. The situation in this case is analogous to the situation presented in *Horton. See Id.* at 130–131, 110 S.Ct. at 2304. *Horton* involved the search of a residence by a police officer pursuant to a warrant which authorized a search for the proceeds of a robbery the officer had been investigating. The officer searched the residence, but he did not find the stolen property listed in the warrant. Instead, during the course of the search, he discovered, in plain view, the weapons used to commit the robbery and seized them. Later the officer testified that while he was searching for the items listed in the warrant he also was interested in finding other evidence connected to the crime. Thus, as the court in *Horton* put it, the seized evidence was not discovered "inadvertently." Nevertheless, the seizure in *Horton* was found lawful because the officer's pres-

1. Defendants do not challenge the validity of their arrest. Nonetheless, the Court would like to note that defendants' arrest was lawful as police officers making an arrest in public—performed in the hallway of an apartment building in this particular case—need only probable cause to make an authorized arrest.

ence at the residence when he discovered the evidence in plain view was lawful and the court determined that no privacy interest had been violated. The same rationale applies in this case. When Agent Gonzalez discovered the bag his presence outside the apartment was completely lawful and the fact that he testified that he was also interested in finding the bag is immaterial to a determination of legality as the bag was in plain view when discovered. No privacy interest was violated by agent Gonzalez in discovering the bag. Thus, agent Gonzalez's seizure of the bag, as the officer's seizure of the weapons in *Horton*, was lawful even though not inadvertent.

The third and final criteria for the plain view exception to apply—that the seized item's evidentiary value be immediately apparent—is satisfied in this case. The bag's evidentiary value was immediately apparent to agent Gonzalez as he testified that he had seen a small package of what turned out to be heroin fall out of the same bag and he suspected that the bag would contain other packages like the one he recovered. Thus, agent Gonzalez's seizure of the bag satisfies all the "plain view" doctrine criteria we find that agent Gonzalez's seizure of the bag was lawful.

■ Agent Gonzalez's seizure of the bag is also justified under the exigent circumstances exception to the Fourth Amendment warrant requirement. Two kinds of exigent circumstances were present in this case. First, requiring agent Gonzalez to obtain a warrant before seizing the bag containing the heroin sought to be suppressed by the defendants would have placed the arresting officers's safety at risk. Second, there was a high probability that the heroine would have been destroyed or hidden if officer Gonzalez would have waited for a warrant to issue.

The First Circuit has held that exigent circumstances are present when a reasonably officer could believe that to delay acting to obtain a warrant would, in all likelihood, frustrate an important police objective, such as to prevent the destruction of evidence relating to criminal activity. *United States v. Rengifo*, 858 F.2d 800, 805 (1st Cir.1988), *cert. denied* 490 U.S. 1023, 109 S.Ct. 1752, 104 L.Ed.2d 189 (1989) (*citing to*, among others, *Schmerber v. California*, 384 U.S. 757, 766–72, 86 S.Ct. 1826, 1833–1836, 16 L.Ed.2d 908 (1966)). The possibility that evidence will be destroyed by defendants that have discovered government surveillance of their activities has also often been recognized by other circuits. *See e.g., United States v. Flickinger*, 573 F.2d 1349 (9th Cir.), *cert. denied* 439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978); *United States v. Gardner*, 553 F.2d 946 (5th Cir.1977) *cert. denied* 434 U.S. 1011, 98 S.Ct. 722, 54 L.Ed.2d 753 (1978); *United States v. Rubin*, 474 F.2d 262 (3rd Cir.1973), *cert. denied* 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973).

The facts present in this case support the Court's conclusion that Agent Gonzalez and those agents accompanying him legitimately feared that if they took the time to obtain a warrant the bag containing the heroin would be either destroyed or hidden. The arrest was performed in public and it probably alerted other drug dealers in the building, possibly confederates of the men arrested, to the presence of police officers and to their possible return to seize any evidence of illicit drug activity.[2] There was evidence presented at the hearing showing that the drug trafficking community at the project was aware of the officers' presence from the moment agent Gonzalez's patrol car reached the beginning of the dead-end street leading to the entrance of building fifteen (15). It was evident that by screaming "Agua!, agua!" members of the drug trafficking community were alerting other members of the community to the presence of law enforcement offi-

2. Although no specific evidence was presented at the hearing showing that the five men arrested were acting with other drug dealers, some courts have expressly relied on the general expectations that police have developed through their experience with drug trafficking—including the expectation that a supplier may have a dealer followed or that an arrested coconspirator or third party observer may report the arrest to the trafficker—to make a finding of exigent circumstances. *See United States v. Hidalgo*, 747 F.Supp. 818 (D.Mass.1990) (*citing to United States v. Mabry*, 809 F.2d 671–674 (10th Cir.1987) and *United States v. Wulferdinger*, 782 F.2d 1473 (9th Cir. 1986)).

cers in the area. Therefore, agent Gonzalez's seizure of the bag was justified in order to prevent the destruction of that evidence.

■ Exigent circumstances are also present where the safety of law enforcement officers or the general public is threatened. *United States v. Lopez*, 989 F.2d 24, 26 (1st Cir.1993) (*citing to Warden v. Hayden*, 387 U.S. 294, 298–99, 87 S.Ct. 1642, 1646, 18 L.Ed.2d 782 (1967) and *United States v. Rengifo*, 858 F.2d at 805). The facts of this case support the Court's finding that agent Gonzalez and the other officers had a reasonable basis to believe that a threat to their safety existed of an urgency and magnitude that would justify a warrantless seizure of the evidence in this case. Given agent Gonzalez's description of the Los Lirios project—especially building fifteen (15)—as a very dangerous "drug point" controlled by drug dealers who had shot at law enforcement officers before, the police officers' fear was justified. Remaining in the building any time longer than necessary to effect the arrests or returning to the building after obtaining a warrant would have put the officers' safety in jeopardy. Thus, agent Gonzalez's warrantless seizure of the bag was justified in order to protect the safety of the police officers.

As we find that the seizure of the heroin in this case was justified pursuant to the "plain view" doctrine and to the existence of exigent circumstances, we rule that defendant's Motion to Suppress is hereby DENIED. Therefore, the Jury Trial remains SET for August 30, 1993.

IT IS SO ORDERED.